FILED

2022 Jul-26  PM 02:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **AVA DAWN CANTRELL,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  4:20-cv-00867-MHH** |
| | } | |
| **KILOLO KIJAKAZI,** | } | |
| **Acting Commissioner of the** | } | |
| **Social Security Administration,[1]** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Ava Cantrell has asked the Court to review a final adverse decision of the Commissioner of Social Security under 42 U.S.C. §§ 405(g).  The Commissioner denied Ms. Cantrell's application for supplemental security income based on an Administrative Law Judge's finding that Ms. Cantrell was not disabled.  Ms. Cantrell argues that the Administrative Law Judge—the ALJ—erred because the ALJ did not accord proper weight to the opinion of a consulting physician, improperly drew adverse inferences from Ms. Cantrell's lack of medical treatment, and did not

---

[1] The Court asks the Clerk to please substitute Kilolo Kijakazi for Andrew Saul as the defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See* FED. R. CIV. P. 25(d) (When a public officer leaves office, that "officer's successor is automatically substituted as a party."); *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

properly account for her obesity.  Ms. Cantrell also argues that the ALJ's RFC analysis is not supported by substantial evidence.  For the following reasons, the Court finds that substantial evidence supports the Commissioner's decision.

## LEGAL STANDARD FOR DISABILITY UNDER THE SSA

To succeed in her administrative proceedings, Ms. Cantrell had to prove that she was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013).  "A claimant is disabled if [s]he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months."  42 U.S.C. § 423(d)(1)(A).[2]  A claimant must prove that she is disabled. *Gaskin*, 533 Fed. Appx. at 930 (citing *Ellison v. Barnhart,* 355 F.3d 1272, 1276 (11th Cir. 2003)).

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process.  The ALJ considers:

---

[2] Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program.  Title XVI of the Act governs applications for Supplemental Security Income or SSI.  "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited June 13, 2022).

(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or medically equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

## ADMINISTRATIVE PROCEEDINGS

Ms. Cantrell applied for supplemental security income on May 25, 2017. (Doc. 8-6, p. 2). Initially, Ms. Cantrell alleged that her disability began December 24, 2016. (Doc. 8-6, p. 2). With the advice of her representative, Ms. Cantrell amended her onset date to May 22, 2017. (Doc. 8-6, p. 24). The Commissioner initially denied Ms. Cantrell's application on June 30, 2017. (Doc. 8-5, p. 2). On July 10, 2017, Ms. Cantrell requested a hearing before an ALJ. (Doc. 8-5, p. 7). Ms. Cantrell appeared without representation at the hearing on February 19, 2019. (Doc. 8-3, p. 104). The ALJ granted a continuance for Ms. Cantrell to

obtain counsel.  (Doc. 8-3, p.  108).  The ALJ reconvened Ms. Cantrell's hearing on

July 2, 2019.  (Doc. 67).  Following the hearing, Ms. Cantrell's attorney asked for a

supplemental hearing to "express [] concern about . . . a psychological evaluation,

which occurred after the [previous] hearing."  (Doc. 8-3, p. 59).  Ms. Cantrell

appeared for the supplemental hearing on September 19, 2021.  (Doc. 8-3, p. 57).

The ALJ issued an unfavorable decision on September 27, 2019.  (Doc. 8-3, p. 29).

On November 22, 2019, Ms. Cantrell filed with the Appeals Council exceptions to

the ALJ's decision.  (Doc. 8-5, pp. 111-12).  On June 4, 2020, the Appeals Council

denied  Ms.  Cantrell's  request  for  review  (Doc. 8-3,  p.  2),  making  the

Commissioner's  decision  final  and  a  proper  candidate  for  this  Court's  judicial

review.  *See* 42 U.S.C. § 405(g).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

*Ms. Cantrell's Medical Records*

To support her application for SSI benefits, Ms. Cantrell submitted medical

records that relate to the diagnosis and treatment of scoliosis, degenerative disc

disease, osteoarthritis, asthma, obesity, mood disorders, and PTSD.  The Court has

reviewed Ms. Cantrell's complete medical history with a focus on the opinions of

Drs. Teschner and Arnold.  The following medical evidence is most relevant to Ms.

Cantrell's arguments for relief from the Commissioner's decision.

*Records of Back Pain, Diagnosis, & Treatment*

In January of 2015, Ms. Cantrell visited Pain and Spine Consultants. She complained of low back pain and leg pain that she rated 10 of 10. She sought medication to help her with housework and self-care. (Doc. 8-8, pp. 12, 14). She weighed 250 lbs. (Doc. 8-8, p. 13). She had limited lumbar range of motion, and she was self-medicating with THC. (Doc. 8-8, p. 15). She received a diagnosis of chronic pain syndrome and degeneration of lumbar intervertebral disc. (Doc. 8-8, p. 15). The record of this visit states: "There is objective evidence of her low back pain." (Doc. 8-8, p. 15). That evidence included an x-ray that revealed 40% disc height loss at L5/S1. (Doc. 8-8, pp. 14-15). Her doctor ordered a lumbar MRI and prescribed pain medication and physical therapy. (Doc. 8-8, p. 15).

When Ms. Cantrell returned to the clinic one month later, she reported that the prescribed medication did not ease her pain. She was taking too much pain medication, and she tested positive for THC. (Doc. 8-8, p. 17). Ms. Cantrell had tenderness in her lumbosacral spine. (Doc. 8-8, p. 18). Ms. Cantrell still was awaiting an MRI report. Her physician warned her that if her drug levels did not fall on her next visit, he would discontinue her pain medication. (Doc. 8-8, p. 19).

Ms. Cantrell's MRI report revealed mild to moderate multilevel spondylosis. (Doc. 8-8, p. 22). When Ms. Cantrell saw her doctor in March of 2015, he ordered

a back brace.  (Doc. 8-8, p. 26).  Her doctor also ordered a psychological assessment. (Doc. 8-8, p. 26).

In May of 2015, Ms. Cantrell had just undergone emergency gallbladder surgery.  Ms. Cantrell had consistent back pain and right leg pain.  She rated her pain 7 out of 10 with medicine and reported that her medication helped her sleep, care for herself, and do housework.  She had had a PT evaluation.  (Doc. 8-8, p. 32).  Ms. Cantrell's urine was screened for prescription and illicit drugs.  Ms. Cantrell tested positive for hydrocodone and hydromorphone and negative for THC.  (Doc. 8-8, pp. 34-35).

In June of 2015, Ms. Cantrell complained of low back pain and leg pain.  (Doc. 8-8, p. 36).  Ms. Cantrell had gone to PT for two weeks and reported that it was too painful.  Ms. Cantrell reported that her right leg pain was "worse than ever."  (Doc. 8-8, p. 36).  Ms. Cantrell reported that her pain was 10 out of 10 with medication, but indicated that the medication improved her sleep, helped her be active, care for herself, and do chores.  (Doc. 8-8, p. 36).  Ms. Cantrell had mild swelling in her leg, and her thoracic spine was tender.  (Doc. 8-8, p. 37).  Ms. Cantrell had limited range of motion due to her gallbladder surgery.  (Doc. 8-8, p. 37).  Ms. Cantrell's urine test was within normal limits.  (Doc. 8-8, p. 36).  She was refitted for her back brace and asked to follow up in one month.  (Doc. 8-8, p. 38).

Ms. Cantrell returned for a follow-up visit in August 2015. Ms. Cantrell reported low back pain and right leg pain that was constant, numb, tingling, burning, and throbbing and that worsened with walking, bending, lifting, contact, sitting, and standing. (Doc. 8-8, p. 39). Ms. Cantrell's urine screening was within normal limits. (Doc. 8-8, pp. 39, 42-43). Ms. Cantrell was asked to follow up in one month. (Doc. 8-8, p. 41).

When Ms. Cantrell returned to the clinic in September of 2015 for a follow up, her urine screening was positive for THC. (Doc. 8-8, p. 44). Ms. Cantrell admitted that she had used THC, and she reported that she was grieving the death of her aunt. (Doc. 8-8, pp. 44-45). Ms. Cantrell reported that her pain was an 8 out of 10 with medication, but she did not display pain behaviors. (Doc. 8-8, pp. 44-45). Ms. Cantrell's lumbosacral spine was tender. She had a mild right limp, and her chronic spinal stenosis in the lumbar region was worsening. (Doc. 8-8, pp. 44, 46). Ms. Cantrell received her fifth positive test for THC in her urine, so the pain clinic discontinued her medications. She left the clinic before she could receive her warning letter and prescriptions. (Doc. 8-8, pp. 44, 46).

In medical visits to other providers for issues other than back pain, Ms. Cantrell often did not report pain or restrictions in activities that she attributed to pain. (*See*, *e.g.*, Doc. 8-8, pp. 90, 92 (reporting 0/10 pain level); Doc. 8-8, pp. 94-95, 97 (reporting moderate exercise including walking and 0/10 pain); Doc. 8-8, pp.

102, 104 (reporting moderate activity and 0/10 pain level); Doc. 8-8, p. 109 (full, normal range of motion; normal gait; motor strength 5/5 in all extremities); Doc. 8-9, p. 162 (range of motion intact in all extremities); Doc. 8-10, pp. 2, (reporting no musculoskeletal symptoms: "normal range of motion, normal strength, no tenderness, no swelling, no deformity");   Doc. 8-10, p. 10 (negative for musculoskeletal symptoms)).

*Dr. Jane Teschner*

Ms. Cantrell visited Dr. Jane Teschner on June 11, 2019 for an independent medical examination.  (Doc. 8-10, p. 62).  Dr. Teschner reviewed Ms. Cantrell's 2014 x-ray of her lumbar spine and her 2015 MRI of her lumbar spine.  (Doc. 8-10, pp. 62-63, 65).  Dr. Teschner noted that Ms. Cantrell was a poor historian who appeared to be of below average intelligence.  (Doc. 8-10, p. 62).

Ms. Cantrell reported that since 2014, she had experienced lower back pain that extended down her legs to the top of her feet.  (Doc. 8-10, p. 63).  Ms. Cantrell explained that "[s]tanding, sitting, and walking for prolonged periods exacerbate[d] her pain."  (Doc. 8-10, p. 63).  Ms. Cantrell reported that she had difficulty with activities of daily living, such as getting dressed, standing to do chores, sleeping, and shopping.  (Doc. 8-10, p. 63).  Ms. Cantrell stated that "[s]he [could not] climb, crawl, squat, kneel, crouch, bend, or carry heavy weight."  (Doc. 8-10, p. 63).

Based on her physical examination of Ms. Cantrell, Dr. Teschner found that Ms. Cantrell appeared alert and oriented and in no acute distress. (Doc. 8-10, p. 63). Dr. Teschner noted that Ms. Cantrell was obese; Ms. Cantrell weighed 276 lbs. (Doc. 8-10, pp. 63-64).

Dr. Teschner indicated that Ms. Cantrell had a "normal appearing cervical, thoracic, and lumbosacral spine[,]" but she had decreased range of motion of the "lumbar spine in all directions." (Doc. 8-10, p. 64). Dr. Teschner noted that Ms. Cantrell could not touch her toes, heel-walk, heel-to-toe walk, tiptoe walk, or squat. (Doc. 8-10, p. 64). Dr. Teschner stated that Ms. Cantrell's "gait and station appear[ed] abnormal and antalgic" and that she "appear[ed] to walk as if she [was] in pain." (Doc. 8-10, p. 64).

Dr. Teschner did not report abnormal neurologic findings, but Dr. Teschner indicated that Ms. Cantrell was depressed and anxious and that she had a blunted affect. (Doc 8-10, p. 64). Dr. Teschner noted that Ms. Cantrell did not seem to have "gross, obvious difficulty with [her] ability to understand." (Doc. 8-10, p. 64). Dr. Teschner opined that Ms. Cantrell would likely have difficulty remembering, concentrating, staying on task, and adapting and interacting socially. (Doc. 8-10, p. 64).

Dr. Teschner listed Ms. Cantrell's diagnoses as lumbar radiculopathy, morbid obesity, and borderline intelligence. (Doc. 8-10, pp. 64-65). Dr. Teschner

concluded that Ms. Cantrell's primary limiting medical issues were moderately severe "chronic lower back and bilateral lower extremity pain and paresthesia." (Doc. 8-10, pp. 64-65).  Dr. Teschner opined that Ms. Cantrell could sit upright for less than 15 minutes at one time and stand for not more than 30 minutes at one time. (Doc. 8-10, p. 61).  Dr. Teschner indicated that Ms. Cantrell would need to lie down, sleep, or sit with her legs propped up for seven hours in an eight-hour daytime period. (Doc. 8-10, p. 61).  Dr. Teschner indicated that Ms. Cantrell would be off-task more than 90% of the time in an eight-hour day and that she should be expected to be absent from work due to her physical symptoms more than 20 days in a 30-day period.  (Doc. 8-10, p. 61).  Dr. Teschner opined that, "[g]iven Ms. Cantrell's low intelligence, she would be most likely qualified for labor-intensive jobs, which she cannot do due to [her] chronic pain."  (Doc. 8-10, p. 65).

### Dr. Mary Arnold

Dr. Arnold is a psychologist.  She evaluated Ms. Cantrell on November 20, 2019.  (Doc. 8-10, p. 67).  Dr. Arnold noted that Ms. Cantrell was morbidly obese, that she had a primary care physician, and that she was not receiving mental health care.  (Doc. 8-10, p. 67).  Dr. Arnold asked Ms. Cantrell about her personal background, her work and education history, and her history of substance abuse, legal issues, and mental health services.  (Doc. 8-10, pp. 67-68).  Dr. Arnold noted

that "Ms. Cantrell [was] . . . a knowledgeable historian and compliant informant." (Doc. 8-10, p. 69).

Dr. Arnold noted that Ms. Cantrell had a composed demeanor, conventional behavior, and normal mood and affect. (Doc. 8-10, p. 68). Ms. Cantrell's cognitive processing skills were typical and intact. (Doc. 8-10, p. 68). Dr. Arnold noted that Ms. Cantrell had no formal psychosis and that she reached her thought processing goals without circumstantial or tangential thinking. (Doc. 8-10, p. 68). Ms. Cantrell reported that she shopped for groceries, cleaned her sister's three-bedroom house, and washed dishes and did laundry. (Doc. 8-10, p. 69).

Without the benefit of testing, Dr. Arnold estimated that Ms. Cantrell's full-scale IQ was in the "low average range." (Doc. 8-10, p. 68). Dr. Arnold completed a medical statement about Ms. Cantrell's ability to perform work-related activities. (Doc. 8-10, pp. 70-71). Dr. Arnold concluded that Ms. Cantrell could, on a sustained basis, independently, appropriately, and effectively understand, remember, and carry out simple and complex instructions; make judgments on simple and complex work-related decisions; and interact appropriately with the public, co-workers, and supervisors. (Doc. 8-10, pp. 70-71). Dr. Arnold believed that Ms. Cantrell would be mildly limited in her ability to respond appropriately to usual work situations and changes in a routine work setting. (Doc. 8-10, p. 71).

*Ms. Cantrell's Administrative Hearing*

Ms. Cantrell's administrative hearing took place on July 2, 2019. (Doc. 8-3, p. 67). Ms. Cantrell testified that she lived with her twin sister and brother-in-law, who help care for her children. (Doc. 8-3, pp. 72, 83). Ms. Cantrell testified that she dropped out of high school in her senior year, but she received her GED in 2006. (Doc. 8-3, p. 72). Ms. Cantrell testified that she worked at a chicken plant, a clothing factory, and some convenience stores. (Doc. 8-3, pp. 73, 75, 79, 84). Ms. Cantrell explained that she had not worked full-time for more than three months. (Doc. 8-3, pp. 73, 75, 79, 84). Ms. Cantrell testified that she was unable to work because she was "dyslexic when it [came] to computers." (Doc. 8-3, p. 83). She explained that she could use Facebook, but she could not otherwise operate a computer. (Doc. 8-3, p. 83). Ms. Cantrell stated that she could not work due to problems with her back and hip. (Doc. 8-3, pp. 79, 82).

Ms. Cantrell testified that she could stand for only 20 minutes before she needed to walk around or sit down so that her legs would not become numb. (Doc. 8-3, p. 79). Ms. Cantrell explained that if she could not walk around, then she would have to stand and sit every fifteen minutes. (Doc. 8-3, p. 79). Ms. Cantrell rated her back pain an 8 of 10 and explained that her pain decreased to 4 with medication. (Doc. 8-3, pp. 80-81). Ms. Cantrell stated that when her pain diminished, she still experienced numbness in her legs. (Doc. 8-3, p. 84). Ms. Cantrell testified that she

had trouble kneeling, crouching, and crawling.  (Doc. 8-3, p. 82).  Ms. Cantrell testified that she used a cane five to ten day per month.  (Doc. 8-3, p. 88).  Ms. Cantrell stated that she could sleep only laying on her stomach, and her pain woke her during the night.  (Doc. 8-3, pp. 85-86).

Regarding mental health, Ms. Cantrell testified that she got along with the people in her household, but she often yelled at strangers.  (Doc. 8-3, pp. 86-87). Ms. Cantrell estimated that she had been engaged in conflicts approximately 50 times in the preceding three years.  (Doc. 8-3, pp. 91-92).  Ms. Cantrell testified that she had a prescription for Celexa for sleep and mood, but she stopped taking the medication when she became pregnant.  (Doc. 8-3, p. 93).

Dr. Kizer, a vocational expert, testified that Ms. Cantrell had work experience as a poultry eviscerator, a store laborer, and a dressed poultry grader.  (Doc. 8-3, p. 94).  Dr. Kizer stated that Ms. Cantrell's past position as a poultry eviscerator was light, unskilled work that Ms. Cantrell performed at the medium exertion level. (Doc. 8-3, p. 94).  Dr. Kizer described Ms. Cantrell's work as a store laborer as medium, unskilled work that Ms. Cantrell performed at the heavy exertion level. (Doc. 8-3, p. 94).  Dr. Kizer explained that Ms. Cantrell's work as a dressed poultry grader was light, semi-skilled work that she performed at the light exertion level. (Doc. 8-3, p. 94).  The ALJ asked Dr. Kizer:

> assume that we have a hypothetical person, the same age, education,
> and work experience as Ms. Cantrell, who can perform light work with

occasional climbing of ramps and stairs. No climbing of ladders, ropes or scaffolds. Frequent balancing, occasional stooping, kneeling, crouching, and crawling. She must avoid concentrated exposure to extreme temperatures and humidity. She must avoid even moderate exposure to vibrations, fumes, odors, dust, gases, poor ventilation, and other pulmonary irritants. And she must avoid all exposure to hazards, such as open flames, unprotected heights, and dangerous moving machinery . . . Could this hypothetical person perform any of Ms. Cantrell's past work?

(Doc. 8-3, p. 94). Dr. Kizer testified that the hypothetical person could not perform Ms. Cantrell's past work. (Doc. 8-3, p. 94). The ALJ asked whether there were other jobs in the economy the individual could perform. (Doc. 8-3, p. 94). Dr. Kizer stated the individual could perform the jobs of a mail clerk and marker. (Doc. 8-3, pp. 94-95).

The ALJ then posed another hypothetical to Dr. Kizer, asking her to assume that there was a second individual with the same limitations as the first but adding that the person needed to change positions every 15 minutes throughout the workday by sitting and standing without leaving her workstation. (Doc. 8-3, p. 95). Dr. Kizer testified that this second individual would be able to perform the jobs of ticket seller and booth cashier. (Doc. 8-3, p. 95).

The ALJ posed a third hypothetical, asking Dr. Kizer to assume that there was a third individual with the same limitations as the second, but with the following additional limitations:

[L]imited to unskilled work, which is simple, repetitive, and routine. Supervision must be simple, direct, and nonconfrontational.

> Interpersonal contact with supervisors must be incidental to the work performed, such as assembly work. She will do best in a well-spaced work setting with her own work area or where she can frequently work alone. She must not be required to work at fast-paced production line speeds. She should have only occasional gradually introduced workplace changes. She must have normal regular work breaks. And she should only have occasional causal contact with the general public. Could this hypothetical person find work in the national economy?

(Doc. 8-3, p. 96).  Dr. Kizer testified that the third individual could not find work in the national economy.  (Doc. 8-3, p. 96).  The ALJ posed a fourth hypothetical where an individual with the same age, education, and work experience as Ms. Cantrell, regardless of other limitations, needed frequent, unscheduled work absences.  (Doc. 8-3, p. 96).  Dr. Kizer testified that while the DOT does not address absenteeism, her experience indicated that the fourth individual would not be able to keep a job in the national economy.  (Doc. 8-3, p. 97). Dr. Kizer opined that the level of absenteeism generally tolerated was one day per month.  (Doc. 8-3, p. 97).

Ms. Cantrell's attorney asked Dr. Kizer if someone with Ms. Cantrell's age, education, and work experience, with the limitation that they could sit for only 15 minutes at a time and then must walk for 10 minutes before returning to the workstation could perform jobs in the national economy.  (Doc. 8-3, p. 98).  Dr. Kizer testified that the individual could not.  (Doc. 8-3, p. 98).

When asked what level of off-task behavior generally was tolerated in the jobs he identified for the ALJ, Dr. Kizer indicated that the range is generally 10% to 15%. (Doc. 8-3, p. 97).  Dr. Kizer testified that a workplace accommodation could be

made to allow a worker to prop their legs at waist level or above for more than four hours in an eight-hour day if needed.  (Doc. 8-3, p. 97).  Dr. Kizer testified that employers typically would accommodate the use of a cane for standing and walking five days per month.  (Doc. 8-3, p. 98).

Ms. Cantrell's attorney requested a supplemental hearing because she was concerned that Dr. Arnold's report did not mention the domestic violence that Ms. Cantrell had experienced and that the report incorrectly stated that Ms. Cantrell had no mental health treatment.  (Doc. 8-3, p. 59).  The ALJ scheduled a supplemental hearing.  (Doc. 8-3, p. 57).

At the supplemental hearing, Ms. Cantrell testified that she was evaluated by the "Social Security Doctor" for 30 minutes.  (Doc. 8-3, p. 60).  Ms. Cantrell testified that she did not see medical records regarding her treatment history, and she did not remember the doctor asking whether she had a history of mental health treatment.  (Doc. 8-3, pp. 60-61).  Ms. Cantrell stated that the doctor spoke with her about whether she and her husband went their separate ways, but she did not ask her about "violence or anything like that."  (Doc. 8-3, p. 61).  Ms. Cantrell testified that she was scheduled for mental health treatment at Quality of Life, but the appointment was postponed because the therapist was not available.  (Doc. 8-3, pp. 61-62).

Ms. Cantrell's attorney asked the ALJ not to rely on Dr. Arnold's evaluation because it was not a thorough psychological evaluation so that Dr. Arnold's

conclusions were not reliable.  (Doc. 8-3, p. 62).  The ALJ responded that he would admit Dr. Teschner's exam and Dr. Arnold's exam and would "give them whatever probative value they're [sic] merited."  (Doc. 8-3, p. 62).

## THE ALJ'S DECISION

In his hearing decision, the ALJ found that Ms. Cantrell had not engaged in substantial gainful activity since May 22, 2017, the alleged onset date.  (Doc. 8-3, p. 34).  The ALJ determined that Ms. Cantrell suffered from the severe impairments of mild scoliosis, mild to moderate multilevel lumbar spondylosis, mild right hip osteoarthritis, mild intermittent asthma, and morbid obesity. (Doc. 8-3, p. 35). Based on a review of the medical evidence, the ALJ concluded that Ms. Cantrell did not have an impairment or a combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Doc. 8-3, p. 40).

Considering Ms. Cantrell's impairments, the ALJ evaluated Ms. Cantrell's residual functional capacity.  The ALJ determined that Ms. Cantrell had the RFC to perform:

> light work . . . with  occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; frequent balancing; and occasional stooping, knee[l]ing, crouching, and crawling. She must avoid concentrated exposure to extreme temperatures and humidity. She must avoid even moderate exposure to vibrations, fumes, odors, dusts, gases, poor ventilation, and other pulmonary irritants; and she

> must avoid all exposure to hazards, such as open flames, unprotected
> heights, and dangerous moving machinery.

(Doc. 8-3, p. 41). "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). "If someone can do light work . . . he can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b). "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

Based on this RFC, the ALJ concluded that Ms. Cantrell could not perform her past relevant work. (Doc. 8-3, p. 45). Relying on testimony from the VE, the ALJ found that jobs existed in the national economy that Ms. Cantrell could perform, including a mail clerk and marker. (Doc. 8-3, p. 46). Accordingly, the ALJ determined that Ms. Cantrell was not under a disability within the meaning of the Social Security Act. (Doc. 8-3, p. 46).

18

## STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel*, 631 F.3d at 1178 (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. If the district court finds an

error in the ALJ's application of the law, or if the district court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the district court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

Ms. Cantrell contends that the ALJ failed to accord proper weight to examining physician Dr. Teschner's testimony, drew adverse inferences from Ms. Cantrell's lack of medical treatment, failed to give her obesity proper consideration, and did not base their decision on substantial evidence. (Doc. 10, p. 2). The Court considers these arguments in turn.

As for Dr. Teschner's opinion, Ms. Cantrell argues that the ALJ failed to afford the proper weight to Dr. Teschner's opinion and failed to state the grounds for his decision to do so. (Doc. 13, p. 5). When evaluating a medical opinion, an ALJ must consider five factors: supportability, consistency, relationship with the claimant, specialization, and other factors.[3] In a written decision, an ALJ must state

---

[3] (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

(3)  Relationship with the claimant. This factor combines consideration of the issues in paragraphs (c)(3)(i)-(v) of this section.

      i.    Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

      ii.    Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

      iii.    Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s).

      iv.    Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s).

      v.    Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder.

(4)  Specialization. The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

(5)  Other factors. We will consider other factors that tend to support or contradict a medical opinion or prior administrative medical finding. This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements. When we consider a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive.

20 C.F.R. § 404.1520c(c)(1)-(5).

the extent to which he found the medical opinions and prior administrative medical findings in the record persuasive.[4]

---

[4] An ALJ must use the following criteria to evaluate the persuasiveness of medical opinions:

> (1) Source-Level Articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

> (2) Most Important Factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

> (3) Equally Persuasive Medical Opinions or Prior Administrative Medical Findings About the Same Issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 404.1520c(b)(1)-(3).

The ALJ found Dr. Teschner's opinion "unpersuasive" because the opinion was "poorly supported" in that Dr. Techner "merely cited to the claimant's spinal conditions, but did not explain why they would result in the limitations she opined." (Doc. 8-3, p. 44). The ALJ stated that Dr. Teschner "recorded no examination findings to support the degree of limitation she alleged," "her opined limitations are inconsistent with other objective findings in the record," and "the claimant's statements to Dr. Teschner regarding her activities of daily living were inconsistent with what she reported elsewhere." (Doc. 8-3, p. 44). The ALJ stated that during the time period at issue, Ms. Cantrell "complain[ed] of pain only a handful of times" and she "consistently exhibited normal sensation and strength of the bilateral lower extremities." (Doc. 8-3, p. 44). The ALJ explained that he gave more weight to the state agency physician's opinion because it was "well-supported by the evidence . . . the spinal diagnostic imaging, BMI in the low 50s, mild intermittent asthma, objective examination findings, and the claimant's adult function report indicating what she is still able to do." (Doc. 8-3, p. 35).

The ALJ's statement that Dr. Teschner recorded no examination findings is incorrect. Based on her examination, Dr. Teschner found that Ms. Cantrell had an antalgic gait, meaning Ms. Cantrell limped because of pain. (Doc. 8-10, pp. 63-64; https://www.webmd.com/pain-management/what-is-antalgic-gait) (last visited July 22, 2022). Dr. Teschner's examination of Ms. Cantrell's musculoskeletal system

revealed decreased range of motion in the lumbar spine in all directions. Dr. Teschner stated that Ms. Cantrell's 2014 x-ray and her 2015 MRI substantiated these findings. (Doc. 8-10, pp. 63-64). Dr. Teschner's diagnoses of degenerative disc disease of the lumbar spine and moderate multilevel spondylosis, (Doc. 8-10, p. 64), was entirely consistent with Ms. Cantrell's treatment records from Pain and Spine Consultants, (Doc. 8-8, pp. 12-46). Those treatment records contradict the ALJ's finding that Ms. Cantrell complained of pain only a handful of times during the period at issue.

Still, substantial evidence supports the ALJ's conclusion that the restrictions that Dr. Teschner reported in Ms. Cantrell's physical capacities form are inconsistent with the evidence in the record. As noted, Dr. Teschner found that Ms. Cantrell could not sit upright for more than 15 minutes at one time or stand for more than 30 minutes at one time and that Ms. Cantrell would need to lie down or sit with her feet propped up for seven hours during an eight-hour period. (Doc. 8-10, p. 61). But Ms. Cantrell's treatment records from the period at issue indicate that though pain medication did not alleviate Ms. Cantrell's back pain, pain treatment did enable her to do housework and sleep. (Doc. 8-8, p. 32). Ms. Cantrell's reports of her routine activities, (Doc. 8-8, pp. 32, 36, 39, 44; *see also* Doc. 8-10, p. 69), are not consistent with Dr. Teschner's more substantial restrictions on activity, (Doc. 8-10, p. 61).

Thus, substantial evidence supports the ALJ's conclusion that Dr. Teschner's opinion is unpersuasive, (Doc. 8-3, p. 44).

As for Ms. Cantrell's lack of medical treatment, Ms. Cantrell correctly states that an ALJ may not draw inferences from a claimant's noncompliance with treatment when it is "the result of an inability to afford treatment." *McCall v. Bowen*, 846 F.2d 1317, 1319 (11th Cir. 1998).  In his opinion, the ALJ stated:  "Though she alleges unremitting, debilitating pain, during the period at issue, she has complained of hip pain once and back pain about two to three times. She received no ongoing pain management."  (Doc. 8-3, p. 42).  Ms. Cantrell contends that the ALJ should have asked follow-up questions pertaining to her lack of consistent pain management treatment.  (Doc. 13, p. 7).

Ms. Cantrell received pain management treatment from January 2015 until September 2015.  (Doc. 8-8, pp. 3-46).  She was discharged from her treatment program on September 16, 2015 when she failed her fifth urinalysis test for THC. (Doc. 8-8, p. 46).  Ms. Cantrell did not receive her prescriptions or discharge letter on that date because she left the facility before the staff could give them to her.  (Doc. 8-8, p. 46).  Thus, Ms. Cantrell's lack of treatment was not an economic issue; Ms. Cantrell stopped receiving treatment from the pain management clinic because, as noted in Ms. Cantrell's records from the program, she violated the program's rules.

Therefore, the ALJ did not have to investigate further to identify the reason why Ms. Cantrell's pain treatment ended.

Ms. Cantrell cites *Early v. Astrue* for her argument that the ALJ did not give proper weight to her obesity. In that case, the district court found that an ALJ erred when he failed to identify obesity as a severe impairment and, therefore, did not consider obesity in combination with the claimant's other impairments. 481 F. Supp. 2d 1233, 1239-40 (N.D. Ala. 2007). This case is distinguishable from *Early*. Here, the ALJ stated that he considered Ms. Cantrell's obesity, and he found that it was severe in combination with her other impairments, but the combination did not meet the level of severity of one of the listed impairments. (Doc. 8-3, p. 40).

> [B]ecause her obesity could reasonably be expected to exacerbate the symptoms of her other severe impairments . . . I find it to be severe in combination. I carefully considered the effects of obesity on her functioning, and the following residual functional capacity reflects the degree of limitation I find in connection with her obesity.

(Doc. 8-3, p. 40). On this record, the ALJ did not overlook Ms. Cantrell's obesity.

Ms. Cantrell argues that "[t]he testimony of the Vocational Expert was not substantial evidence of ability to work because the hypothetical question relied upon did not accurately state Claimant's pain level or her residual functional capacity." (Doc. 13, p. 8-9). Ms. Cantrell contends that the hypothetical question incorrectly assumed that she could perform light work, contrary to the opinion of Dr. Teschner. As discussed, the ALJ found Dr. Teschner's opinion unpersuasive, and substantial

evidence supports that conclusion.  Therefore, the ALJ did not have to account for Dr. Teschner's opinion in hypotheticals he posed to the VE.  *See McSwain v. Bowen*, 814 F.2d 617, 619-20 (11th Cir. 1987) (finding that a hypothetical question is proper when it contains the functional limitations the ALJ found supported by evidence in the record); *Graham v. Bowen*, 790 F.2d 1572, 1576 (11th Cir. 1986).

Based on the vocational expert's testimony, the ALJ found that Ms. Cantrell was not disabled.  (Doc. 8-3, p. 40).  The ALJ proceeded to step five and determined there were other jobs in the economy that Ms. Cantrell could perform.  (Doc. 8-3, p. 41).  Consequently, substantial evidence supports the ALJ's conclusion that Ms. Cantrell was not disabled.

## CONCLUSION

For the reasons discussed above, the Court finds that substantial evidence supports the ALJ's decision, and the ALJ applied proper legal standards.  Accordingly, the Court affirms the Commissioner.  The Court will enter a separate final judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this July 26, 2022.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE